**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION**

| | | |
|---|---|---|
| Interactive Learning Systems Inc. dba | : | |
| Interactive College of Technology, | : | |
| and Elmer Smith, | : | |
| | : | |
|     Plaintiffs, | : | |
| | : | CIVIL ACTION |
| v. | : | FILE NO. _____ |
| | : | |
| Minerva Capital Management Inc., Minerva | : | |
| Inflection Strategies, LP., Stanford B. | : | |
| Silverman, and Jon Coover, | : | |
| | : | |
|     Defendants. | : | |
| | : | |

## COMPLAINT

**COME NOW** Interactive Learning Systems, Inc. dba Interactive College of Technology ("ICT"), and Elmer Smith ("Smith") (collectively referred to as "Plaintiffs"), by and through undersigned counsel, and hereby make and file this Complaint against Minerva Capital Management Inc. ("MCM"), Minerva Inflection Strategies, LP ("MIS"), Stanford B. Silverman ("Silverman"), and Jon Coover ("Coover") (collectively referred to as "Defendants"), showing the Court as follows in support hereof:

## **PARTIES**

1.

Plaintiff Elmer Smith is a Georgia resident.

2.

Plaintiff Interactive Learning Systems, Inc. is a Georgia corporation in the education field that operates under the registered trade name, Interactive College of Technology.

3.

Plaintiffs Interactive Learning Systems, Inc. and Interactive College of Technology are enterprises engaged in activities which affect interstate and foreign commerce.

4.

Plaintiff Elmer Smith is the Chief Executive Officer of Interactive Learning Systems, Inc. d/b/a Interactive College of Technology.

5.

Defendant Stanford B. Silverman is a New York resident who resides at 100 West 57th Street, Apt. 11Q, New York, NY 10019 in New York County and may be served at said address.

6.

Defendant Jon Coover is a South Dakota resident who resides at 300 Fairway Circle, Brandon, SD 57005 in Minnehaha County and is an employee of Minerva Capital Management at 100 West 57th Street, Suite 11, New York, NY 10019, and may be served at said addresses.

7.

Defendant Minerva Capital Management Inc. is a New York corporation and may receive service of process through the Secretary of State of New York.

8.

Based on Plaintiffs' information and belief, Defendant Minerva Inflection Strategies, LP. is a New York limited partnership and may receive service on its CEO, Defendant Stanford Silverman.

9.

Defendant Stanford Silverman is the Chief Executive Officer of Minerva Capital Management Inc. and Minerva Inflection Strategies LP.

## JURISDICTION AND VENUE

10.

Defendants are subject to the jurisdiction of this court pursuant to O.C.G.A § 9-10-91, Georgia's Long Arm Statute, because Defendants transacted business and have committed tortious acts and omissions within the state.

11.

Venue is proper in this court pursuant to O.C.G.A. § 9-10-93 because a substantial part of the business and tortious acts occurred in the Northern District of Georgia, specifically in and around Dekalb County, Georgia.

12.

This Court's jurisdiction and venue are proper pursuant to 18 U.S.C. § 1965 and 28 U.S.C. §1332 because the matter in controversy violates RICO statutes (18 U.S.C. § 1961 – 1968), exceeds the value of $75,000, and is between citizens and corporations of Georgia, New York and South Dakota.[1]

---

[1] 28 U.S.C. § 1332 (2020)

- 4 -

## BACKGROUND FACTS

13.

From July 2018 to January 2020, Defendants engaged in a multistate scheme to defraud, manipulate, pressure and ultimately gain control of Plaintiffs and Plaintiffs' agents by integrating themselves under false pretenses into Plaintiffs' operations, thereby gaining valuable knowledge, skills, monies, and information from Plaintiffs for use to acquire ICT, and other entities also engaged in interstate commerce, in efforts to undermine Plaintiffs and Plaintiffs' interests.

14.

Peachtree Credit Company LLC ("PCC") is a Georgia limited liability corporation and is an enterprise that engages in activities affecting interstate and foreign commerce.

15.

On July 18, 2018, MCM and ICT signed a Non-Disclosure Agreement to protect and keep confidential information that ICT would disclose to MCM about ICT and related entities.

16.

During the period between August 6, 2018 and August 27, 2019, Defendants proposed a series of seven (7) letters of intent to Plaintiffs for the purchase of ICT

and related entities, two (2) of which were signed by Plaintiff Smith and Defendant Silverman, dated September 10, 2018 and August 27, 2019.

17.

On December 22, 2018, a verbal agreement was reached for the purchase of ICT by Defendants outlining the rationale, representation, and contingencies for the purchase.

18.

In December 2018, Plaintiffs invited Defendants to the January 7, 2019 ICT Annual Meeting.

19.

In late January 2019, Defendants' agent, being Defendant Coover, moved to Georgia in order to study and analyze Plaintiff's business operation at ICT's headquarters in Chamblee, Georgia.  He also came to learn about ICT's extensive English as a Second Language ("ESL") program, a program in which the Defendants had no prior experience.  Plaintiffs agreed to pay Defendants a monthly stipend of twenty-one thousand dollars ($21,000) per invoices prepared and submitted by Defendant Jon Coover.  Subsequently, Defendants agreed to reimburse Plaintiffs for their payments to Coover.

20.

On each invoice for monthly stipend, Defendant Coover used email and other electronic means affecting interstate commerce to expressly represent and confirm the impression that he devoted at least forty hours per week to providing pre-acquisition period management services to ICT.

21.

Silver Betty Inc. is a marketing company in New York City, New York, engaged in activities in and affecting interstate commerce, purportedly specializing in private education sector marketing, and is partly owned and operated by Silverman and his immediate family.

22.

During Coover's employment with ICT, Defendants insisted on and completed the transfer of most of ICT's marketing services to Silver Betty Inc., at a significantly higher management fee of $14,400 per month, without providing any reconciliation of the work, time, or monies expended on behalf of ICT, including spending $3,000 monthly on unauthorized international marketing activities and monthly prepayments averaging approximately $20,000 to Silver Betty Inc. for payments allegedly made on behalf of ICT.

23.

Ziad K. Abdelnour is a New York resident who resides at 10825 72nd Avenue, Apt 3L, Forest Hills, NY 11375 in Queens County and is the president, chief executive officer and co-owner of BlackHawk Partners Inc., a New York-based unregistered private equity "family office" located at 445 Park Ave, FL 9, New York, NY 10022.

24.

In June 2019, via teleconference from New York, Ziad Abdelnour assured Plaintiff Smith that Defendants were viable entities fully capable of purchasing ICT and that any necessary funding for Defendants' purchase would be provided by Abdelnour as an "investor," if needed.  Plaintiff Smith relied upon these assurances.

25.

On August 27, 2019, after a series of protracted negotiations lasting over a year, Plaintiffs and Defendants executed a final Letter of Intent ("LOI") between ICT, PCC, and Minerva Inflection Strategies, LP.[2]

26.

Plaintiffs were told that Defendants contemplated the purchases of other proprietary schools.  These schools included, but were not limited to, Empire Beauty School in

---

[2] Exhibit A – Letter of Intent (August 27, 2019).

Pennsylvania.  Defendants told Plaintiffs that ICT would be combined with these schools after Defendants had purchased ICT.

27.

At no time did Defendants reveal to Plaintiffs their real intent, which was to insinuate and imbed themselves into Plaintiffs' businesses so the Defendants could acquire ICT on terms that were substantially different and superior for Defendants than the terms of the LOI. Defendants would then use the revenue from ICT to fund their other acquisitions.

28.

The LOI stated that MIS would purchase all ICT and PCC stock and interests from Plaintiff Smith for $44 million.  This reflected the intent and understanding of the Plaintiffs as communicated by Defendants to Plaintiffs.

29.

The LOI stated that the said total purchase price of $44 million would be paid by MIS as follows: $7 million would be paid upon execution of a "Definitive Agreement"; thereafter, Defendants would pay Smith quarterly three equal payments of $7 million;  Defendants would then pay Smith $7.2 million on the first anniversary of the Definitive Agreement when the closing would take place; and the balance of $8.8 million would be paid to Smith over five (5) years after closing.

30.

The LOI was prepared by Defendants and stated, "We anticipate signing a Definitive

Agreement on or before December 31, 2019."

31.

Additionally, the LOI stated the following:

> "[Coover] shall assume the position of Chief Executive Officer of ICT and of
>
> PCC, on or before the signing of the definitive agreement and shall manage
>
> and oversee the Companies in such capacity, subject to the oversight of the
>
> Company's Boards of Directors.
>
> a.   Compensation will be $25,000 monthly.
>
> b.   At closing MIS will reimburse Elmer Smith the remuneration
>
>       paid to Dr. Jon R. Coover during the 2019 calendar year."

32.

The LOI stated further that Smith would legally transfer control of ICT and PCC to

MIS upon Smith's receipt of the $35.2 million set forth in the LOI along with normal

and necessary regulatory approvals and ancillary agreements at closing.

33.

Finally, for purposes relevant to this Complaint, the LOI provided that it would

terminate upon "the failure of the parties to reach agreement on the Definitive

Agreement and ancillary documents by December 31, 2019," unless terminated sooner based on regulatory or other government action or upon a Definitive Agreement having been reached; neither contingency which in fact occurred.

34.

On or about August 28, 2019, Coover misled ICT management to order a SunTrust ICT Corporate credit card with a twenty thousand dollars ($20,000) credit limit under the false pretense that the account had been authorized by Plaintiffs to be used solely for expenses directly related to the business of ICT.

35.

In September 2019, Smith met with Defendant Silverman at which time Silverman assured Smith that he would receive a draft Definitive Agreement in three weeks.

36.

In September 2019, Coover requested that the monthly payments he had been receiving from ICT be changed from invoice payments to payroll in order for he and his wife to qualify for ICT health insurance and benefits.

37.

On October 10, 2019, Smith requested an update from Silverman on the status of the Definitive Agreement, and Silverman replied, "The definitive agreement is progressing nicely and is in the hands of Minerva's attorneys."

38.

On October 10, 2019, an untimely and improper communication which occurred between Defendants and an associate executive director of an accrediting agency resulted in Smith being unexpectedly asked by the associate executive director whether Smith planned to apply for a change of ownership regarding the upcoming sale of ICT to Defendants. The communication between Defendants and the third party constituted a breach of the LOI, specifically, the Confidentiality Clause of Section B under "Binding Terms" which continued the full force and effect of the July 18, 2018 Non-Disclosure Agreement.

39.

On October 11, 2019, Silverman emailed Smith, to " . . . expect a preliminary definite agreement to be completed for your review in November."

40.

On November 15, 2019, Defendants presented Plaintiffs with an unpaginated and incomplete template for a stock purchase agreement which Silverman had personally edited ("Silverman Agreement").

41.

The Silverman Agreement was an unprofessional document that departed without explanation from the LOI in numerous material, significant, and relevant ways

including, but not limited to: (1) changing the timing of the commencement of payments of the quarterly installments to the closing date instead of on the execution date of the Definitive Agreement; (2) MIS would pay Smith only $7.0 million dollars prior to Smith's transfer of ownership to MIS; (3) MIS was not obligated to obtain financing but to only use its "reasonable best efforts" to secure financing; and (4) ICT and PCC were obligated to "provide reasonable cooperation and assistance" to help MIS obtain financing.

42.

Smith responded to the Silverman Agreement with a list of concerns dealing with the material departures and other issues with the draft. Smith then followed up on Defendants' failure to respond to these concerns by emails on November 27, 2019 and December 9, 2019.

43.

On December 10, 2019, Defendants replied to Smith's email to address some of Plaintiffs' questions and concerns but avoided explaining or reconciling any of the material departures in the Silverman Agreement from the LOI.

44.

On December 31, 2019, the LOI expired.

45.

On January 21, 2020, Smith discovered that Defendants had fraudulently engineered multiple overpayments to Coover, that Coover had been provided a company credit card, and that Coover had made well over thirty thousand dollars ($30,000) in unauthorized charges with that credit card.

46.

On January 21, 2020, upon checking the payroll register, Smith discovered that Coover had been receiving a direct deposit of twenty-five thousand dollars ($25,000) semi-monthly, instead of monthly, effectively resulting in five (5) doubled salary payments to Coover.

47.

Defendants had received and verified the payroll register each pay period yet did not report any of the overpayments to Plaintiffs.

48.

On January 21, 2020, upon questioning Michael Power of ICT, Smith was informed that, after Coover's requested transfer to payroll had been implemented, Defendants had continued submitting invoices for additional monthly payments of twenty-five thousand dollars ($25,000) each of the previous three months.

49.

Defendants intentionally submitted their fraudulent invoice for January 2020 in mid-December, rather than at the end of month, in efforts to ensure its payment prior to potential discovery.

50.

On January 21, 2020, Smith discovered Defendants had falsely represented to ICT staff that Smith had authorized Defendants to receive a corporate credit card upon which Defendants had been incurring charges since on or about September 20, 2019.

51.

On January 22, 2020, Plaintiffs informed Defendants of the improper salary overpayments and unauthorized credit card charges and made demand by email for immediate repayment.

52.

Defendants did not respond to Plaintiffs' January 22, 2020 email.

53.

On January 29, 2020, Plaintiffs received a draft Equity Purchase Agreement and Management Services Agreement prepared by Defendants' attorneys in Washington, D.C. and St. Louis, Missouri ("St. Louis Agreements").

54.

The terms of the St. Louis Agreements, like the Silverman Agreement, contained unexplained and substantial material departures from the LOI. These departures were even more egregious than the departures in the Silverman Agreement.  They included, but were not limited to: (1) the five quarterly installment payments, totaling $35.2 million, were to be paid to an escrow account instead of to Smith directly; (2) the $35.2 million would not be released to Smith until after the purchase closed instead of at the execution of a Definitive Agreement; (3) Coover was to immediately become CEO of ICT and PCC upon execution of a Definitive Agreement; and (4) ICT was to pay MIS a monthly management fee of $583,333 beginning January 1, 2020.

55.

On January 31, 2020, Plaintiffs sent notice to Defendants terminating all negotiations with Defendants for the following reasons: (1) Defendants unilaterally deviated significantly and deliberately from the LOI; (2) Defendants misled the ICT payroll department to overpay Coover in combined invoiced and salary payments; and (3) Defendants charged Plaintiffs' credit card for Defendants' transactions that were unrelated to Plaintiffs or Plaintiffs' interests or to the negotiations between the Parties.

56.

On February 1, 2020, Defendants responded to Plaintiffs' January 31, 2020 termination notice claiming, among other things, that the LOI was not legally binding and Defendants were not obligated to reimburse Plaintiffs for any advances made to Defendants because a Definitive Agreement was never finalized.

57.

On February 10, 2020, Plaintiffs sent a letter to Defendants providing documentation of the amounts owed to Plaintiffs and offering to compromise Plaintiffs' claim of $443,648.88 for $400,000 if Plaintiffs received payment from Defendants by the end of February 2020.

58.

By e-mail dated February 22, 2020, Defendant Silverman reiterated Defendants refusal to reimburse Plaintiffs as Plaintiffs had requested but did agree to "return overpayments" to Plaintiffs. To date, Defendants have returned no funds to Plaintiffs, including the overpayments.

<u>**COUNT I**</u>

QUANTUM MERUIT

59.

Plaintiffs incorporate by reference the allegations set forth in paragraphs 1 to 58 hereinabove.

60.

Under Georgia law, to state a claim for quantum meruit, a plaintiff must show: (1) the performance of valuable services; (2) that were accepted by the recipient or at his request; (3) that the failure to compensate the provider would be unjust; and (4) that the provider expected compensation at the time services were rendered.[3]

61.

Plaintiffs provided valuable services, including but not limited to substantial salary, training and benefits, to Defendants.

62.

Defendants requested, secured and accepted the services of Plaintiffs.

63.

Plaintiffs would be dealt an injustice if allowed to go uncompensated or reimbursed for the months of training, benefits and resources provided to Defendants.

---

[3] <u>Amend v. 485 Props.,</u> 627 S.E.2d 565, 567 (Ga. 2006).

64.

Plaintiffs fully expected reimbursement for all monies and services rendered to Defendants during the periods contemplated in the LOI.

## COUNT II

UNJUST ENRICHMENT (O.C.G.A. §9-2-7)

65.

Plaintiffs incorporate by reference the allegations set forth in paragraphs 1 to 64 hereinabove.

66.

Ordinarily, when one renders service or transfers property which is valuable to another, and which the latter accepts, a promise is implied to pay the reasonable value thereof.[4] An unjust-enrichment claim arises when a plaintiff confers a benefit on a defendant for which the plaintiff should be equitably compensated.[5]

---

[4] O.C.G.A. § 9-2-7 (2019).
[5] City of Atlanta v. Hotels.com, 710 S.E.2d 766, 771 (Ga. 2011).

67.

Plaintiffs conferred benefit on Defendants by providing valuable training to Defendants in ESL and other proprietary industry areas, and Defendants obtained valuable proprietary information from Plaintiffs.

68.

Defendants requested and accepted the benefit of months of high-level specialized training from Plaintiffs.

69.

Plaintiffs would suffer injustice and harm if not compensated for the time, resources, proprietary knowledge, and industry trade secrets Plaintiffs provided to Defendants in paid training, creating competitive disadvantages and other equitable imbalances to be exploited adversely to Plaintiffs' interests.

## COUNT III

### MONEY HAD AND RECEIVED

70.

Plaintiffs incorporate by reference the allegations set forth in paragraphs 1 to 69 hereinabove.

71.

"An action for money had and received is appropriate where the plaintiff overpays or deposits more than was necessary with another, who has no legal right to retain the money."[6]

72.

Plaintiffs overpaid Coover in the amount of $137,500.00 through salary overpayments and fraudulent invoices.

73.

Defendants have no legal right to retain the $137,500.00 in combined overpayments.

## COUNT IV

### MONEY HAD AND RECEIVED

74.

Plaintiffs incorporate by reference the allegations set forth in paragraphs 1 to 73 hereinabove.

---

[6] Cochran v. Ogletree, 536 S.E.2d 194,197 (Ga. App. 2000)

75.

"An action for money had and received is appropriate where the plaintiff overpays or deposits more than was necessary with another, who has no legal right to retain the money."[7]

76.

Plaintiffs overpaid Coover in the amount of $39,996.98 through unauthorized credit card charges.

77.

Defendants have no legal right to retain the $39,996.98 in unauthorized credit card charges.

## COUNT V

CIVIL ACTION (O.C.G.A. §51-10-6) &
THEFT BY CONVERSION (O.C.G.A. §16-8-4)

78.

Plaintiffs incorporate by reference the allegations set forth in paragraphs 1 to 77 hereinabove.

---

[7] Cochran v. Ogletree, 536 S.E.2d 194,197 (Ga. App. 2000)

79.

A person violates O.C.G.A. §16-8-4, when having lawfully obtained funds of another under an agreement or obligation to make a specified application of such funds, he knowingly converts the funds to his own use in violation of the agreement or legal obligation.[8]

80.

Coover obtained funds from Plaintiffs in the form of monthly compensation pursuant to agreed terms.

81.

Coover knew the obtained funds were in excess of the agreed upon amount of twenty-five thousand dollars ($25,000) intended for Defendants.

82.

Coover knowingly received five (5) salary overpayments of twelve thousand five hundred dollars ($12,500), cumulatively totaling $62,500 of additional salary.

83.

Coover knew the overpayments should be returned to Plaintiffs, yet Coover continued to collect, deposit and request additional unauthorized funds, and

---

[8] O.C.G.A. 16-8-4 (2019).

Defendants have failed and refused to return said monies to Plaintiffs after admitting to receiving said monies inappropriately.

## COUNT VI

CIVIL ACTION (O.C.G.A. §51-10-6) &
THEFT BY CONVERSION (O.C.G.A. §16-8-4)

84.

Plaintiffs incorporate by reference the allegations set forth in paragraphs 1 to 83 hereinabove.

85.

A person violates O.C.G.A. §16-8-4 when having lawfully obtained funds of another under an agreement or obligation to make a specified application of such funds, he knowingly converts the funds to his own use in violation of the agreement or legal obligation.[9]

86.

Defendants obtained $39,996.98 in funds from Plaintiffs by way of an expense account linked to a SunTrust ICT Corporate credit card.

---

[9] O.C.G.A. 16-8-4 (2019).

87.

Defendants knew the obtained funds were intended to be used for Plaintiffs' company purposes.

88.

Defendants knowingly and admittedly used Plaintiffs' SunTrust ICT Corporate credit card for non-company related purposes not authorized by Plaintiffs, and have refused to reimburse Plaintiffs.

## COUNT VII

CIVIL ACTION (O.C.G.A. §51-10-6) &
THEFT BY DECEPTION (O.C.G.A.§16-8-3)

89.

Plaintiffs incorporate by reference the allegations set forth in paragraphs 1 to 88 hereinabove.

90.

A person violates O.C.G.A. §16-8-3 when he obtains property by any deceitful means with the intention of depriving the owner of the property. "Deceitful means" includes: (1) intentionally creating or confirming another's impression of an existing fact or past event which is known or believed to be false; (2) failing to

correct a false impression of an existing fact or past event previously created or confirmed; or (3) promises performance of services which he does not intend to perform or knows will not be performed.[10]

91.

Coover obtained and deposited three (3) additional monthly stipends of twenty-five thousand dollars ($25,000) by creating and submitting a series of false invoices to Plaintiffs each month.

92.

Coover confirmed the knowingly false impression that he was owed an invoiced amount each month and failed to correct the false impression that Coover was to continue being paid via invoice after being switched to salaried payments.

93.

Defendants' intention to deprive Plaintiffs of their property is evidenced by Defendants' failure to report the excess payments and refusal to reimburse Plaintiffs after admitting to receiving Plaintiffs' property inappropriately.

---

[10] O.C.G.A. § 16-8-3 (2019).

## COUNT VIII

CIVIL ACTION (O.C.G.A. §51-10-6) &
THEFT BY DECEPTION (O.C.G.A. §16-8-3)

94.

Plaintiffs incorporate by reference the allegations set forth in paragraphs 1 to 93 hereinabove.

95.

A person violates O.C.G.A. §16-8-3 when he obtains property by any deceitful means with the intention of depriving the owner of the property. "Deceitful means" includes: (1) intentionally creating or confirming another's impression of an existing fact or past event which is known or believed to be false; (2) failing to correct a false impression of an existing fact or past event previously created or confirmed; or (3) promises performance of services which he does not intend to perform or knows will not be performed.[11]

96.

Defendants obtained $39,996.98 through an expense account linked to a SunTrust ICT Corporate credit card by intentionally creating or confirming the

---

[11] O.C.G.A. § 16-8-3 (2019).

impression to ICT management of a prior authorization which Defendants knew to be false.

97.

Defendants' intention to deprive Plaintiffs of their property is evidenced by Defendants' refusal to reimburse Plaintiffs after admitting to receiving Plaintiffs' property inappropriately.

## COUNT IX

### FRAUDULENT MISREPRESENTATION (O.C.G.A. §23-2-52)

98.

Plaintiffs incorporate by reference the allegations set forth in paragraphs 1 to 97 hereinabove.

99.

Misrepresentation of a material fact, made willfully to deceive or recklessly without knowledge and acted on by the opposite party or made innocently and mistakenly and acted on by the opposite party, constitutes legal fraud.[12]

---

[12] O.C.G.A. § 23-2-52

100.

On or about October 21, 2019, November 22, 2019, and December 16, 2019, Coover willfully misrepresented the material fact of Plaintiff's debt to Defendants for monthly stipend in the amount twenty-five thousand dollars ($25,000) by submitting invoices for fraudulent debt owed by Plaintiffs.

101.

Plaintiffs' agents, acting on the misrepresentations of Defendants, provided funds in the amount of twenty-five thousand dollars ($25,000) for each invoice to pay the fraudulent debt.

102.

Defendants used the fraudulent invoices to obtain three payments of twenty-five thousand dollars ($25,000) from Plaintiffs, creating damages to Plaintiffs cumulatively totaling seventy-five thousand dollars ($75,000).

## **COUNT X**

FRAUDULENT MISREPRESENTATION (O.C.G.A. §23-2-52)

103.

Plaintiffs incorporate by reference the allegations set forth in paragraphs 1 to 102 hereinabove.

104.

"Misrepresentation of a material fact, made willfully to deceive or recklessly without knowledge and acted on by the opposite party or made innocently and mistakenly and acted on by the opposite party, constitutes legal fraud."[13]

105.

On or about August 28, 2019, Defendants willfully misrepresented the material fact of Plaintiffs' authorization for Coover to receive a SunTrust ICT Corporate credit card with twenty thousand dollars ($20,000) revolving credit limit.

106.

Plaintiffs' agents, acting on the misrepresentations of Defendants, provided an unauthorized SunTrust ICT Corporate credit card to Coover.

107.

Defendants used the unauthorized SunTrust ICT Corporate credit card to incur unauthorized charges cumulatively totaling $39,996.98, none of which were related to ICT business.

---

[13] O.C.G.A. § 23-2-52

## COUNT XI

BREACH OF CONTRACT (O.C.G.A. §13-4-20)

108.

Plaintiffs incorporate by reference the allegations set forth in paragraphs 1 to 107 hereinabove.

109.

The elements for a breach of contract claim under Georgia law are: (1) the breach, and (2) resultant damages (3) to the party who has the right to complain about the contract being broken.[14]

110.

Defendants breached the LOI by disclosing the subject matter of the contemplated agreement being negotiated between Plaintiffs and Defendants to an outside person, to wit, a director of an accrediting institution.

111.

Plaintiffs were damaged by the breach due to disclosure of confidential information and increased regulatory scrutiny resulting directly from Defendants' breach.

112.

Plaintiffs are the parties injured by Defendants' breach.

---

[14] Bates v. JPMorgan Chase Bank, 768 F.3d 1126 (11th Cir. 2014).

## COUNT XII

BREACH OF COVENANT OF GOOD FAITH AND FAIR DEALING

113.

Plaintiffs incorporate by reference the allegations set forth in paragraphs 1 to 112 hereinabove.

114.

In New York, the covenant of good faith and fair dealing embraces a pledge that neither party shall do anything which will have the effect of destroying or injuring the right of the other party to receive the fruits of the contract and is implied in every contract governed under New York law.  Accordingly, a breach of the implied duty of good faith is considered a breach of the underlying contract.[15]

115.

Defendants breached the covenant of good faith and fair dealing as applied to the August 27, 2019 Letter of Intent which, pursuant to its governing law provision as drafted by Defendants, is governed by and construed in accordance with the laws of the state of New York.

---

[15] Boart Longyear Ltd. v. Alliance Indus., Inc., 869 F.Supp.2d 407 (S.D. N.Y. 2012).

116.

Defendants acted so as to injure the right of Plaintiffs to receive the fruits of the contract manifest in the August 27, 2019 LOI. Defendants used the silence of the termination provisions in subsections a. and c. of Section E. to deny Plaintiff's reimbursement so as to unduly pressure Plaintiffs to agree to contract terms detrimental to Plaintiffs and as to which Plaintiffs either had previously rejected, to which they had never consented, or the terms of which had not previously been related to them.

## COUNT XIII

CIVIL REMEDIES FOR RICO VIOLATIONS (18 U.S.C. §1964)

117.

Plaintiffs incorporate by reference the allegations set forth in paragraphs 1 to 116 hereinabove.

118.

The elements of a *prima facie* civil RICO claim under 18 U.S.C. §1964(c) are: (1) the defendant committed a pattern of RICO predicate acts under 18 U.S.C. §1962;

(2) the plaintiff suffered injury to business or property; and (3) the defendant's racketeering activity proximately caused the injury.[16]

119.

The elements constituting a pattern of racketeering activity are: (1) the defendants committed two or more predicate acts within a ten-year time span; (2) the predicate acts were related to one another; and (3) the predicate acts demonstrated criminal conduct of a continuing nature.[17]

120.

District Courts have jurisdiction to prevent and restrain violations of 18 U.S.C. § 1962 by issuing appropriate orders prohibiting any person from engaging in similar endeavors, and any person injured in his business or property by reason of a violation of 18 U.S.C. §1962 may sue in District Court and shall recover threefold the damages he sustains and the cost of the suit, including a reasonable attorney's fee.[18]

121.

It is a violation of 18 U.S.C. §1962 for any person conspiring with, engaging in, or receiving income from a pattern of racketeering activity, expressly those involving

---

[16] Simpson v. Sanderson Farms, Inc., 744 F.3d 702, 705 (11th Cir.2014)
[17] Murphy v. Farmer, 176 F.Supp.3d 1325, 1343 (N.D. Ga. 2016)
[18] 18 U.S.C. § 1964(a)-(c) (2020).

wire fraud pursuant to 18 U.S.C. §1343, to acquire or maintain therefrom any interest in any enterprise which is engaged in interstate or foreign commerce.[19]

122.

It is a violation of 18 U.S.C. §1343 when any person intending to devise any scheme to defraud, or obtain money by fraudulent pretenses, representations, or promises, transmits or causes to be transmitted, by means of wire communication in interstate or foreign commerce, any writings or sounds for the purpose of executing such scheme.[20]

123.

Defendants herein collectively are an enterprise engaged in and whose activities affect interstate commerce.

124.

Defendants agreed to and did conduct and participate in the conduct of the enterprise's affairs through a pattern of racketeering activity and for the unlawful purpose of intentionally defrauding Plaintiffs; specifically:

    a.    From January 2019 to January 2020, Defendant Coover used emails to further Defendants' scheme by falsely representing via invoice that he

---

[19] 18 U.S.C. § 1962(a)-(b),(d) (2020).
[20] 18 U.S.C. § 1343 (2020).

devoted at least forty hours per week to providing pre-acquisition period management services to ICT.

b.    In June 2019, Defendants used a teleconference to further their scheme by assuring Plaintiffs of Defendants' financial soundness and professional viability, yet provided no subsequent commitment or evidence thereof or at any time thereafter;

c.    On or about August 28, 2019, Defendants used emails to further their scheme by seeking an unauthorized SunTrust ICT corporate credit card from which to fund activities to acquire Empire Beauty School and other activities not related to ICT;

d.    On October 10, 2019, Defendants used emails to further their scheme by falsely assuring Plaintiffs that professional progress was being made toward a Definitive Agreement;

e.    On October 11, 2019, Defendants used email to further their scheme by falsely assuring Plaintiffs that a professionally drafted document would be delivered to Plaintiffs by mid-November; and

f.    In October and December 2019, Defendants used email to submit fraudulent invoices to obtain unauthorized payments from Plaintiffs.

125.

Pursuant to and in furtherance of their fraudulent scheme, Defendants committed multiple related acts of Wire Fraud violating 18 USC §1343.

126.

The emails sent on August 28, 2019, October 10, 2019, and October 11, 2019 and the invoices submitted in October and December of 2019 by Defendants constitute a pattern a racketeering activity pursuant to 18 U.S.C. §1961.

127.

Defendants conspired to use the income from 18 USC §1343 violations to acquire interests and maintain control of interstate companies or entities including, but not limited to, Empire Beauty School located in the Commonwealth of Pennsylvania.

128.

Defendants conspired in a scheme, spanning years and transmitted via wire communication in interstate commerce, to defraud Plaintiffs of monies, proprietary information, and other good and valuable consideration under false pretenses, representations and promises.

129.

Defendants have directly and indirectly conducted and participated in the conduct of the enterprise's affairs through a pattern of racketeering activity described above, in violation of 18. U.S.C. §1962(c).

130.

As a direct and proximate result of the Defendants' racketeering activities and violations of 18 U.S.C. §1962(c), Plaintiffs have been injured in their business and property through the loss of $405,500.00 in authorized[21] and unauthorized payments and of $39,996.98 in unauthorized credit card charges.

## COUNT XIV

CIVIL REMEDIES FOR RICO VIOLATIONS (O.C.G.A. §16-14-4)

131.

Plaintiffs incorporate by reference the allegations set forth in paragraphs 1 to 130 hereinabove.

---

[21] Plaintiffs' use the term "authorized" only insofar as Plaintiffs held a good faith belief that Plaintiffs were receiving the benefit of at least forty hours per week of Coover's management services on ICT matters.

132.

The purpose of the Georgia RICO Act is to provide compensation to private persons injured by reason of any RICO violation with a stated goal of compensating victims and providing incentive for private attorneys general to initiate actions against those in violation of the Act.[22]

133.

Under the Georgia RICO Act, it is unlawful for anyone to acquire an interest in or control of money or property through a pattern of racketeering activity, and any person injured, by a preponderance of the evidence, has a cause of action for three times the actual damages, punitive damages, attorneys' fees, and the costs of investigation and litigation reasonably incurred.[23]

134.

In Georgia, racketeering activity occurs when a defendant twice commits, attempts, coerces or conspires to commit predicate offenses outlined in O.C.G.A. §16-4-3, including Theft by Deception (O.C.G.A. §16-8-3), Theft by Conversion (O.C.G.A. §16-8-4), or any offense defined under the Federal RICO statutes, in furtherance of one or more interrelated schemes or transactions.[24]

---

[22] Williams General Corp. v. Stone, 279 Ga. 428, 429-430 (Ga. 2005)
[23] O.C.G.A. § 16-14-6(a)-(c).
[24] Maddox v. Southern Eng'g Co., 216 Ga. App. 6, 7 (1994); Massey, Inc. v. Moe's Sw. Grill, LLC (N.D. Ga. 2015).

135.

Violation of the Georgia RICO statute does not require that there be proof of an enterprise, but only that the accused acquired money through a pattern of racketeering activity or proceeds derived therefrom.[25]

136.

A corporation can be found liable, under Georgia's RICO statute, for acts of employees and agents acting within their scope of employment and on behalf of the corporation.[26]

137.

Defendants committed the predicate offenses of Theft by Deception, Theft by Conversion, and Wire Fraud, on the dates and locations noted hereinabove, with each offense directly harming Plaintiffs.

138.

Defendants engaged in a scheme of racketeering activities, including Theft by Deception, Theft by Conversion, and Wire Fraud, to acquire interest in and money from Plaintiffs.

---

[25] Cobb Cnty. v. Jones Grp. P.L.C., 218 Ga. App. 149, 152-53 (1995)
[26] Id.

139.

As a direct and proximate result of the Defendants' racketeering activities and violations of O.C.G.A. §16-14-4, Plaintiffs have been injured in their business and property through the loss of $405,500.00 of authorized and unauthorized salary payments and $39,996.98 of unauthorized credit card charges.

## COUNT XV

PUNITIVE DAMAGES (O.C.G.A. §51-12-5.1)

140.

Plaintiffs incorporate by reference the allegations set forth in paragraphs 1 to 139 hereinabove.

141.

Punitive damages may be awarded only in such tort actions in which it is proven by clear and convincing evidence that a defendant's actions showed willful misconduct, malice, fraud, wantonness, oppression, or that entire want of care which would raise the presumption of conscious indifference to consequences.[27]

---

[27] O.C.G.A. § 51-12-5.1 (2019).

142.

Defendants have committed fraud by misrepresenting Plaintiffs' authorization for a corporate credit card then using the credit to purchase unauthorized items.

143.

Defendants have committed fraud by submitting false invoices to Plaintiffs agents to obtain and retain additional stipend payments.

144.

Defendants have committed fraud by engaging in a scheme to obtain monies, proprietary information, and other good and valuable consideration under false pretenses and without rending in return those things to Plaintiffs contemplated by and reasonably anticipated to constitute the benefits and compensation resulting from the dealings with Defendants.


## COUNT XVI

RECOVERY OF EXPENSES OF LITIGATION (O.C.G.A. §13-6-11)

145.

Plaintiffs incorporate by reference the allegations set forth in paragraphs 1 to 144 hereinabove.

146.

The expenses of litigation generally shall not be allowed as a part of the damages; but where the plaintiff has specially pleaded and has made prayer therefor and where the defendant has acted in bad faith, has been stubbornly litigious, or has caused the plaintiff unnecessary trouble and expense, the jury may allow them.[28]

147.

Defendants have acted in bad faith by intentionally delivering materially deficient Definitive Agreements to Plaintiffs and refusing to reimburse Plaintiffs for fraudulent charges unless Plaintiffs agreed to be bound by the terms placed by Defendants into said agreements.


## **PRAYER FOR RELIEF**

**WHEREFORE**, Plaintiffs pray that process issue and be served upon Defendants, and that Judgment be found for the Plaintiffs as follows:

1. On Count I, Plaintiffs to be awarded all compensatory, punitive, and any other damages deemed just and proper by this Court.
2. On Count II, Plaintiffs to be awarded all compensatory, punitive, and any other damages deemed just and proper by this Court.

---

[28] O.C.G.A. § 13-6-11 (2019).

3. On Count III, Plaintiffs to be awarded all compensatory, punitive, and any other damages deemed just and proper by this Court.

4. On Count IV, Plaintiffs to be awarded all compensatory, punitive, and any other damages deemed just and proper by this Court.

5. On Count V, Plaintiffs to be awarded all compensatory, punitive, and any other damages deemed just and proper by this Court.

6. On Count VI, Plaintiffs to be awarded all compensatory, punitive, and any other damages deemed just and proper by this Court.

7. On Count VII, Plaintiffs to be awarded all compensatory, punitive, and any other damages deemed just and proper by this Court.

8. On Count VIII, Plaintiffs to be awarded all compensatory, punitive, and any other damages deemed just and proper by this Court.

9. On Count IX, Plaintiffs to be awarded all compensatory, punitive, and any other damages deemed just and proper by this Court.

10. On Count X, Plaintiffs to be awarded all compensatory, punitive, and any other damages deemed just and proper by this Court.

11. On Count XI, Plaintiffs to be awarded all compensatory, punitive, and any other damages deemed just and proper by this Court.

12. On Count XII, Plaintiffs to be awarded all compensatory, punitive, and any other damages deemed just and proper by this Court.

13. On Count XIII, Defendants ordered to cease all commercial endeavors in the education field and Plaintiffs to be awarded treble compensatory damages and any other damages deemed just and proper by this Court.

14. On Count XIV, Defendants ordered to cease all commercial endeavors in the education field and Plaintiffs to be awarded treble compensatory damages and any other damages deemed just and proper by this Court.

15. On Count XV, Plaintiffs to be awarded all punitive damages deemed just and proper by this Court.

16. On Count XVI, Plaintiffs to be awarded reimbursement of all attorneys' fees and all other costs of litigation against Defendants.

Respectfully submitted this __19th__ day of August 2020.

Bob Barr
Georgia Bar No. 039475
Attorney for Plaintiffs

Brannon Burroughs
Georgia Bar No. 571927
Attorney for Plaintiffs

Law Offices of Bob Barr
2120 Powers Ferry Road
Suite 125
Atlanta, GA 30339
(770) 836-1776

VERIFICATION

I, Elmer Smith, have read and understand the foregoing Complaint, Interactive

Learning Systems, Inc. dba Interactive College of Technology and Elmer Smith v.

Minerva Capital Management Inc., Minerva Inflection Strategies, LP., Stanford B.

Silverman, and Jon Coover, and I hereby verify that any factual statements asserted

in this Complaint are true and correct to the best of my knowledge and belief.


_____

Elmer Smith
*Plaintiff*



*Sworn to and subscribed before me this* 12th *day of August 2020.*


_____

*Notary Public*

KAREN A MILLER
Notary Public, Georgia
Dekalb County
My Commission Expires
April 10, 2022

*My Commission Expires:* _____

# EXHIBIT A



**MINERVA**
Inflection Strategies, LP.

August 27, 2019

Mr. Elmer Smith
5303 New Peachtree Road Chamblee
Atlanta, Georgia 30341

      Re:    Letter of Intent – Interactive Learning Systems. Inc., dba Interactive College
            of Technology ("**ICT**"), and Peachtree Credit Company ("**PCC**" and
            together with ICT, the "**Companies**")

Dear Elmer,

As we discussed, below you will find the proposed terms of Minerva Inflection Strategies, LP
(dba Minerva Capital Management, "**MIS**") to purchase all of the issued and outstanding shares
of ICT and PCC ("**Letter of Intent**") from you ("**Seller**").

The non-binding terms of this Letter of Intent are as follows:

I.    **Purchase Price.** MIS will purchase 100% of the stock of the Companies from
      Seller at a valuation of $44.0 million (the "**Purchase Price**"), which represents a
      multiple of 6.875 x 2018 forecasted combined EBITDA of $6.4 million, as adjusted
      pursuant to the terms and conditions of this Letter of Intent. The Purchase Price
      assumes the Companies are delivered on a cash-free, debt-free basis, and with adequate
      net working capital to support the ongoing operations of the business. For purposes of
      this purchase, ICT is valued at $43,125,000 and PCC is valued at $875,000.

      a.  Net working capital will be adequate if the income statement for the Companies for
          the period that is ninety days after closing has cumulative revenue that exceeds
          cumulative expenses, exclusive of extraordinary expenses, preaid expenses, and
          expenses related to, or incurred in connection with, the purchase of the Companies. In
          the event that such cumulative expenses exceed cumulative revenue, the Companies
          shall pay MIS the difference. Any working capital true-up payment owed to MIS shall
          be due not later than ten days after the parties complete the post-closing working
          capital adjustment calculation, and may be set-off against the final installment payment
          of $8.8 million owed from MIS to Seller (described below). In addition, MIS shall

provide Seller with a one-time credit of the monies paid as compensation to Dr. Coover during the pre-acquisition period which shall be also be factored into the post-closing working capital true-up.

b. Installment payments of the Purchase Price shall be made quarterly to Seller, as the sole owner of all of the shares of ICT and PCC, starting with $7 million (such initial payment, the "**Earnest Deposit**") to be paid upon the execution of a definitive agreement ("**Definitive Agreement**"). Thereafter, payments will be made as follows:

- $7 million 90 days after the execution date;
- $7 million 180 days after the execution date;
- $7 million 270 days after the execution date; and
- $7.2 million on the first anniversary of the execution date.

The remaining $8.8 million will be paid principal and interest at market prime interest rates, adjusted annually over a period of 5 years following the closing date. We anticipate signing a Definitive Agreement on or before December 31, 2019.

## 2. Timing.

The execution of the Definitive Agreement and the payment of the Earnest Deposit shall occur upon the satisfaction of any and all audits conducted by an educational regulatory agency relating to ICT/PCC, including without limitation the current open matter pertaining to the recent visit to Texas by the Council of Occupational Education, are completed and resolved to the satisfaction of the parties.

In the Definitive Agreement, Seller shall provide customary representations and warranties relating to the Companies in a stock sale transaction, including without limitation, relating to (i) the resolution and completion of the pending audits and matters set forth in Section 2(a)(1)-(2) above, and (ii) liabilities arising pre-closing. The Definitive Agreement shall also contain other standard representations, warranties, covenants and agreements that are customary for this type of transaction.

b. On or before the execution of the Definitive Agreement:

1. Dr. Jon R. Coover shall assume the position of Chief Executive Officers of each of ICT and PCC, on or before the signing of the definitive agreement and shall manage and oversee the Companies in such capacity, subject to the oversight of the Company's Boards of Directors.
   a. Compensation will be $25,000 monthly.
   b. At closing MIS will reimburse Elmer Smith the remuneration paid to Dr. Jon R. Coover during the 2019 calendar year.
   c. In addition, ICT will pay invoices for Silver Betty, Inc. for $28,900 for May 2019 and June 2019.

2. Seller shall continue to serve on the Companies' boards of directors with the right to name a majority of the board of directors, until $35.2 million has been paid and the transaction has closed by MIS to Seller on the first anniversary of the execution date, at which time, board control will transition to MIS, to be more fully described in the Definitive Agreement.

c.   The closing of the transaction shall occur promptly upon:

1. the receipt by Seller of $35.2 million from MIS;
2. the receipt of all regulatory consents and approvals from the applicable regulators and accreditors, including without limitation, U.S. Department of Education, Council on Occupational Education and states of Georgia, Texas and Kentucky, and any other governmental authorities that regulate the Companies; and
3. execution and delivery of ancillary agreements, including Seller's employment agreement, and other customary closing deliverables.

Upon the closing of the transaction, the stock purchase would become effective and the ownership of the Companies would legally transfer from Seller to MIS.

3. **Seller's Post-Closing Employment**.  Seller will provide transition services to the Companies for a minimum of six months post-closing, with an additional six-month extension, as necessary for the operation of the business. Seller would consult in the areas of school operations and introduction to political and regulatory contacts as appropriate. Remuneration for Seller will be based upon his current salary calculated on a per diem basis. MIS will continue Seller's health insurance, automotive leases and country club expenses as they relate to the operations of ICT and PCC during the term of Seller's employment.  Seller also agrees not to compete against the Companies for a period of 4 years post-closing within a 100 mile radius of any location of the Companies.

4. **Due Diligence**.  MIS has completed due diligence to its satisfaction, but reserves the right to request any additional information that it deems relevant to the transaction.

5. **Continued Employment of ICT Senior Managers**.  MIS will retain the ICT executive management teams as this is essential to maintaining the energy and morale necessary for ICT and PCC's continued success and a smooth transition. The executive management of ICT will continue to perform in accordance with their present positions including additional responsibilities that may be communicated in accordance with MIS's strategic growth imperatives.

6. **Lease of Real Estate**. MIS has reviewed the ICT lease agreements and will continue with the real estate agreements currently in place, subject to landlord approval or consents.

7. **Operations Prior to Closing**. From the date of the execution of this Letter of Intent through the closing date, the Seller and the Companies' management will continue to operate the Company in the ordinary course of business and consistent with past practices, subject to such other covenants as may be included in the Definitive Agreement, and will consult in good faith with MIS concerning any material transactions or deviations from such ordinary course. Working capital, including inventory and accounts receivable, will be managed in a similar manner.

**Binding Terms:**

A. **Exclusivity**.  In consideration of the expenses that MIS has incurred and will incur in connection with the proposed transaction, Seller agrees that until October 30, 2019 (such period, the "**Exclusivity Period**"), neither PCC nor ICT, nor any of its representatives, officers, employees, directors, agents, stockholders, subsidiaries or affiliates nor Seller (collectively, the "**Seller Group**") shall initiate, solicit, entertain, negotiate, accept or discuss, directly or indirectly, any proposal or offer from any person or group of persons other than MIS and its affiliates (an "**Acquisition Proposal**") to acquire all or any significant part of the business and properties, capital stock or capital stock equivalents of ICT and PCC, whether by merger, purchase of stock, purchase of assets, tender offer or otherwise, or provide any non-public information to any third party in connection with an Acquisition Proposal or enter into any agreement, arrangement or understanding requiring it to abandon, terminate or fail to consummate the Transaction with MIS. Seller agrees to immediately notify MIS if any member of the Seller Group receives any indications of interest, requests for information or offers in respect of an Acquisition Proposal. Immediately upon execution of this Letter of Intent, Seller shall, and shall cause the Seller Group to, terminate any and all existing discussions or negotiations with any person or group of persons other than MIS and its affiliates regarding an Acquisition Proposal. Seller represents that no member of the Seller Group is party to or bound by any agreement with respect to an Acquisition Proposal other than under this Letter of Intent.

B. **Confidentiality**.  This Letter of Intent is confidential to the parties hereto and their representatives and is subject to the confidentiality agreement entered into between MIS, PCC and ICT on July 18, 2018, which continues in full force and effect.

C. **Governing Law**.   THIS TERM SHEET SHALL BE GOVERNED BY AND CONSTRUED IN ACCORDANCE WITH INTERNAL LAWS OF THE STATE OF NEW YORK, WITHOUT GIVING EFFECT TO ANY CHOICE OR CONFLICT OF LAW PROVISION OR RULE (WHETHER OF THE STATE OF NEW YORK OR ANY OTHER JURISDICTION) THAT WOULD CAUSE THE APPLICATION OF LAWS OF ANY JURISDICTION OTHER THAN THOSE OF THE STATE OF NEW YORK.

D. **Expenses**.  The parties will each pay their own transaction expenses, including the fees and expenses of investment bankers and other advisors, incurred in connection with the proposed transaction.

E. **Termination of Letter of Intent**. This Letter of Intent shall terminate on the first to occur of

    a. either party's written notice to terminate based on the receipt of a negative response from any governmental authority or regulatory body provided however, that no such inquiries shall be made absent advance approval by Seller;

    b. the execution of a Definitive Agreement and ancillary documents;

    c. the failure of the parties to reach agreement on the Definitive Agreement and ancillary documents by December 31, 2019;

The binding provisions of this Letter of Intent shall survive any terminate of this Letter of Intent.

F. **Miscellaneous**. This Letter of Intent may be executed in counterparts, each of which shall be deemed to be an original, but all of which together shall constitute one agreement. The headings of the various sections of this Letter of Intent have been inserted for reference only and shall not be deemed to be a part of this Letter of Intent.

[signature page follows]

If the foregoing is acceptable, please sign a copy of this in the space provided below and return the copy to the undersigned by August 30, 2019.

Very truly yours,

Minerva Inflection Strategies (MIS), LP
(dba Minerva Capital Management)

_Stanford B. Silverman_ 8-27-19
By: Stanford B. Silverman
CEO

Confirmed and Agreed To:

Interactive Learning Systems, Inc, dba the Interactive College of Technology

_Elmer R. Smith_ CEO  8/27/19
By: Elmer R. Smith

CEO

Peachtree Credit Company

_Elmer R. Smith_ CEO  8/27/19
By: Elmer R. Smith

CEO

_Elmer R. Smith_  8/27/19
Elmer R. Smith, as Seller

Minerva Inflection Strategies   100 WEST 57TH STREET-SUITE 11 ·NEW YORK, N.Y. 10019·
              212-582-9491